[PUBLISH]

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE ELEVENTH CIRCUIT

_____

No. 19-15145-P

_____

IN RE: JAMES DAILEY,

Petitioner.

_____

Application for Leave to File a Second or Successive
Habeas Corpus Petition, 28 U.S.C. § 2244(b)

_____

Before ED CARNES, Chief Judge, WILSON, and WILLIAM PRYOR, Circuit
Judges.

ED CARNES, Chief Judge:

In 1987 James Dailey was convicted of murdering 14-year-old Shelly

Boggio and sentenced to death. In the 33 years since Dailey's trial, he has filed a

direct appeal, four state postconviction motions, two state habeas petitions, two

federal habeas petitions, one Rule 60(b) motion, and one Rule 60(d) motion.[1] In

---

[1] See Dailey v. Sec'y, Fla. Dep't of Corr., No. 8:07-cv-1897, 2019 WL 6716073 (M.D.
Fla. Dec. 10, 2019), Doc. 117 (denying Rule 60(b) motion); id. Doc. 116 (Dec. 9, 2019) (denying

none of them did he succeed in convincing a court to vacate his conviction. Now

with his execution drawing near,[2] Dailey asks this Court for authorization to file

yet another federal habeas petition so that he can raise an actual innocence claim, a

Brady claim, and an ineffective assistance of counsel claim. See 28 U.S.C.

§ 2244(b)(3)(A) ("Before a second or successive application permitted by this

section is filed in the district court, the applicant shall move in the appropriate

court of appeals for an order authorizing the district court to consider the

application.").

Our authority to grant Dailey's application is restricted by the AEDPA,

which limits the filing of second or successive petitions in several ways. First, any

claim a state prisoner raises in a second or successive petition must be new,

meaning it cannot have been presented in an earlier petition. 28 U.S.C.

---

Rule 60(d) motion); Dailey v. Sec'y, Fla. Dep't of Corr., No. 8:19-cv-2956 (M.D. Fla. Dec. 5, 2019), Doc. 6 (dismissing 28 U.S.C. § 2254 petition because his claim is not cognizable in habeas); Dailey v. State, 283 So. 3d 782, 786–87 (Fla. 2019) (detailing procedural history through November 2019). Dailey has filed an application for a COA in this Court seeking permission to appeal the district court's denial of his Rule 60 motions and a related motion for limited discovery and an evidentiary hearing. The present application is not dependent on that one's outcome.

[2] On September 25, 2019, Governor Ron DeSantis signed Dailey's execution warrant authorizing the sentence to be carried out the week of November 4, 2019, and the Warden set the specific date for November 7, 2019. Dailey, No. 8:07-cv-1897, Doc. 57. On October 23, 2019, the district court stayed the execution until December 30, 2019. Id. Doc. 81. By December 30, the execution warrant that Governor DeSantis issued had expired. He has not yet signed a new execution warrant.

§ 2244(b)(1) ("A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed."). Second, even a new claim brought in a second or successive petition shall be dismissed unless:

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(A)–(B). We may authorize the filing of a second or successive petition only if we determine that the applicant has made "a prima facie showing" that his claims are new and fall within one of those exceptions. Id. § 2244(b)(3)(C); see also In re Holladay, 331 F.3d 1169, 1173–74 (11th Cir. 2003) (holding that an applicant satisfies the prima facie standard only if "in light of the documents submitted with the application it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition").

Dailey contends that all three of his claims are new and fall within the exception set out in § 2244(b)(2)(B) because they depend on newly discovered evidence: (1) an Indian Rocks Beach police report summarizing a recorded interview with Oza Shaw, a man who was with Dailey and Shelly Boggio on the night of the murder; (2) audio recordings of interviews, including Shaw's, conducted by law enforcement; (3) criminal and incarceration records of three jailhouse informants who testified at Dailey's trial, as well as letters that they sent to the prosecutor in Dailey's case; (4) fact and expert opinion affidavits and records about the "unduly suggestive interrogation techniques" that were used in Dailey's case "to interrogate witnesses and to manufacture jailhouse informant testimony"; (5) fact affidavits casting doubt on Dailey's confession to a jailhouse informant that he committed the murder; and (6) affidavits signed in 2017 and 2019 by Jack Pearcy, another man who was with Dailey and Shelly Boggio on the night of the murder, in which Pearcy states that he alone killed Boggio.

## I.    ACTUAL INNOCENCE CLAIM

Dailey contends that the newly discovered evidence proves he is actually innocent of murdering Shelly Boggio and that, as a result, it would be unconstitutional to execute him. See Herrera v. Collins, 506 U.S. 390, 417 (1993) ("assum[ing], for the sake of argument in deciding this case, that in a capital case a

truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional"). As a preliminary matter, it is "not settled whether a freestanding actual innocence claim is viable in a capital case on federal habeas corpus review." Johnson v. Warden, Ga. Diagnostic & Classification Prison, 805 F.3d 1317, 1324 (11th Cir. 2015). The Herrera Court merely assumed, without deciding, that such a claim would be viable. Herrera, 506 U.S. at 417. But even if we also assume that such a claim is viable, Dailey cannot raise an actual innocence claim in his successive petition for three independently adequate reasons.

## A. Dailey Has Already Raised an Actual Innocence Claim

First, § 2244(b)(1) provides that a "claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." That means this Court may not grant a federal habeas petitioner authorization to file a second or successive petition that only recycles an already-raised claim. In re Williams, 898 F.3d 1098, 1099 (11th Cir. 2018) ("For applications requesting authorization to file a second or successive petition pursuant to § 2254, this Court has consistently applied § 2244(b)(1) to prohibit the filing of a claim that is the same as a claim presented in a petitioner's initial habeas petition before the district court."); In re Baptiste, 828 F.3d 1337,

1339 (11th Cir. 2016) (applying the same rule "where a prisoner seeks leave to file a second or successive habeas motion based on a claim we rejected in a previous application seeking such leave").

That rule bars Dailey's actual innocence claim. In 2007, when Dailey filed his first federal habeas petition, he claimed that he was entitled to a new trial because he had newly discovered evidence proving that Pearcy murdered Shelly Boggio while Dailey was at home in his bedroom. Doc. 1 at 53–54.[3] The district court dismissed that claim, concluding both that "actual innocence is not itself a constitutional claim," and that even if it was, Dailey could not meet the "extraordinarily high" threshold the Court contemplated in Herrera. Dailey v. Sec'y Fla. Dep't of Corr., No. 8:07-cv-1897, 2008 WL 4470016, at *3 (M.D. Fla. Sep. 30, 2008) (quotation marks omitted) (granting in part the government's motion to dismiss petitioner's habeas petition).[4]  In his current application, Dailey again contends that he has newly discovered evidence that will prove that Pearcy murdered Shelly Boggio while Dailey was at home in his bedroom.

---

[3]  All docket entry citations are to Dailey v. Sec'y, Fla. Dep't of Corr., No. 8:07-cv-1897 (M.D. Fla), unless otherwise noted.

[4]  The district court concluded that Dailey's claim could also be read to assert that the state court committed an error of state law when it denied the claim during state post-conviction proceedings. Id. at *2. It correctly held that such an argument was not cognizable in federal habeas proceedings. Id.; see also, e.g., Waddington v. Sarausad, 555 U.S. 179, 192 n.5 (2009) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (quotation marks omitted).

The only difference between this claim and the one he made in 2007 is some of the evidence each claim relies on. In 2007, Dailey pointed to Shaw's testimony from the state post-conviction proceedings and to Pearcy's 1993 deposition. Doc. 1 at 53–56. Here, Dailey also points to, among other things, the Indian Rocks Beach police report, audiotaped interviews of Shaw and Bailey, records and affidavits relating to his jailhouse confessions, and Pearcy's 2017 and 2019 affidavits.

As we have repeatedly held, however, new evidence does not a new claim make, not for purposes of § 2244(b)(1). See In re Hill, 715 F.3d 284, 292 (11th Cir. 2013) (holding that a petitioner cannot "convert his previously asserted claim into a wholly new claim merely by coming forward with new supporting evidence or even new legal arguments") (quotation marks omitted); In re Mills, 101 F.3d 1369, 1371 (11th Cir. 1996) (denying an application to file a second or successive petition with claims supported by new affidavits because the claims had been "presented in a prior petition").

Instead, what matters for purposes of § 2244(b)(1) is whether "the basic thrust or gravamen" of the petitioner's legal argument is the same. See In re Williams, 898 F.3d at 1099. And in this case, it is. At bottom, Dailey is asserting the same thing he asserted in 2007: that he is and always has been innocent of murdering Shelly Boggio, so the Constitution requires that the judgment against

7

him be set aside. Any new evidence he is submitting is merely supportive of that same claim; it is not the basis of a new one. See In re Hill, 715 F.3d at 293. As a result, Dailey has not made a prima facie showing that his claim survives § 2244(b)(1)'s new claim requirement.

### B.  Dailey Has Not Identified a "But For" Constitutional Violation

Second, even if Dailey's actual innocence claim were new, he would still have to make a prima facie showing that he can meet the requirements set out in § 2244(b)(2)(B) before we could permit him to file that claim in a successive petition. He has not, and he cannot do so.

Section 2244(b)(2)(B)(ii) requires that when an applicant seeks to file a claim based on newly discovered evidence, as Dailey does here, he must show "clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense." We have explained that this provision requires two showings: (1) "clear and convincing evidence of actual innocence," and (2) another, separate "constitutional violation." In re Davis, 565 F.3d 810, 823 (11th Cir. 2009).

And that "separate constitutional violation" cannot be an actual innocence claim. See Johnson, 805 F.3d at 1324 (describing this as an "actual innocence plus standard") (quotation marks omitted). When interpreting Section 2244(b)(2)(B)(ii)

in the context of a freestanding actual innocence claim, we have explained that the

"constitutional error" that provision requires must be another constitutional

violation that "is not based upon the guilt or innocence of the petitioner." Id.

Otherwise, the statute would read that the new evidence must "be sufficient to

establish by clear and convincing evidence that, but for the fact that the applicant

was actually innocent, no reasonable factfinder would have found the applicant

guilty of the underlying offense." Id.

That reading would strike from the statute the "but for constitutional error"

language. Id. That we may not do. See Henry Schein, Inc. v. Archer & White

Sales, Inc., 139 S. Ct. 524, 530 (2019) ("Congress designed the Act in a specific

way, and it is not our proper role to redesign the statute."). Even if Congress could

or should have done more, it still "wrote the statute it wrote — meaning, a statute

going so far and no further." Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund, 138 S. Ct.

1061, 1073 (2018) (quoting Michigan v. Bay Mills Indian Cmty., 134 S. Ct. 2024,

2033–34 (2014) (internal quotation marks omitted)); see Dodd v. United States,

545 U.S. 353, 359 (2005) ("When the statute's language is plain, the sole function

of the courts — at least where the disposition required by the text is not

absurd — is to enforce it according to its terms. . . . It is for Congress, not this

Court, to amend the statute."); Puerto Rico v. Franklin Calif. Tax-Free Tr., 136 S.

Ct. 1938, 1949 (2016) ("[O]ur constitutional structure does not permit this Court to rewrite the statute that Congress has enacted.") (quotation marks omitted). Because we are bound by the statute that Congress did write, we have held that it "undeniably requires a petitioner seeking leave to file a second or successive petition to establish actual innocence by clear and convincing evidence <u>and</u> another constitutional violation." <u>In re Davis</u>, 565 F.3d at 824.[5]

Because Dailey has not made a prima facie showing of another constitutional violation that is tethered to his actual innocence claim, <u>see</u> <u>infra</u> Parts II & III, he has not made a prima facie showing that he has met the requirements of § 2244(b)(2)(B). <u>See</u> <u>Johnson</u>, 805 F.3d at 1324 ("Even assuming that Johnson could meet the requirement of due diligence in § 2244(b)(2)(B), his claims would fail because he has not asserted, much less shown, both actual innocence <u>and</u> an underlying 'but for' constitutional violation.").

C. <u>Dailey Has Not Met Herrera's Demanding Actual Innocence Standard</u>

Dailey's actual innocence claim would have another problem, even if we were to assume that a freestanding actual innocence claim is cognizable in federal

---

[5] Dailey argues in his application that our decision in <u>In re Davis</u> is wrong, but we are bound by that published precedent and all of the decisions that have followed it. <u>See</u> <u>Walker v. Mortham</u>, 158 F.3d 1177, 1188 (11th Cir. 1998) ("The prior precedent rule, which binds later panels to the decisions of former panels, is essential to maintaining stability in the law. The rule is 'emphatic' and 'firmly established' in the Eleventh Circuit.").

habeas; and assume that such a claim is cognizable in a second or successive petition despite our holding to the contrary in <u>In re Davis</u>; and assume that Dailey's claim is not barred by § 2244(b)(1). Even with all of those assumptions, to make the required prima facie showing under § 2244(b)(3)(C), he "also must demonstrate that there is a reasonable likelihood" that he can satisfy the demanding standard for actual innocence set forth in <u>Herrera</u>. <u>In re Holladay</u>, 331 F.3d at 1173. And he cannot do that.

The Supreme Court in <u>Herrera</u> assumed, but did not hold, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417. But the Court made clear that the required "truly persuasive demonstration" should, and would, be very difficult to make. <u>Id.</u> It acknowledged the "very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States." <u>Id.</u> That is why the Court emphasized that "the threshold showing for such an assumed right would necessarily be <u>extraordinarily high</u>." <u>Id.</u> (emphasis added).

Dailey's new evidence, at most, casts some degree of doubt on some of the testimony the State presented at trial. The credibility of one of the three jailhouse informants, Paul Skalnik, has been called into doubt.[6] But we are not jurors deciding in the first instance whether the State has proved its case beyond a reasonable doubt. See Herrera, 506 U.S. at 401 ("Federal courts are not forums in which to relitigate state trials.") (quoting Barefoot v. Estelle, 463 U.S. 880, 887 (1983)). We are a court of appeals deciding more than 30 years after a murder whether the inmate who was convicted of it, and whose conviction has been upheld at every turn for three decades, has shown a reasonable likelihood of meeting the "extraordinarily high" burden of making a "truly persuasive demonstration" that he is actually innocent. Id. at 417. Dailey has not done that. He has not because even if we take Dailey's new evidence into account, and even if we erase entirely Skalnik's testimony, there remains substantial unrefuted evidence of Dailey's guilt.

Dailey admits that the following facts are undisputed. Application at 10 n.10. On May 5, 1985, Boggio, her sister, and a female friend were hitchhiking when Pearcy, Dailey, and Shaw picked them up. They all went to a bar where Boggio was turned away, and then they went to Pearcy's house where they drank

---

[6] The layout of the jail where Dailey was housed and the procedures in place for prisoners in protective custody, like Skalnik, establish that Dailey could not have confessed to Skalnik in the way Skalnik said he did. App'x TT. And other evidence indicates Skalnik lied about other matters during the trial.

alcohol and smoked marijuana together. After that, Pearcy, Dailey, the three girls, and Pearcy's pregnant girlfriend Bailey left the house (Shaw stayed there). Boggio's sister and friend went to their own homes, while Pearcy, Dailey, Boggio, and Bailey went to a bar called Jerry's. At Jerry's, Dailey asked Boggio to dance with him but she refused, and then she sought out Pearcy and danced with him. Boggio, Dailey, Bailey, and Pearcy all returned to Pearcy's house from Jerry's.

According to the "newly discovered" Shaw interview, Shaw, Pearcy, and Boggio left the house again after that, without Dailey. See App'x J.[7] Pearcy and Boggio dropped Shaw off at a pay phone around 1:15 a.m., where he made two phone calls. Id.; App'x M. Then Shaw walked home, where Dailey was asleep in his bedroom and Bailey was awake in the living room. App'x J. Shaw talked with Bailey in the living room for a while, and at some point Pearcy returned to the house alone. Id. Pearcy picked up Dailey and they left the house together. Id. After that, Shaw fell asleep on the couch. Id. Pearcy and Dailey returned sometime later, which woke up Shaw. Id. At that time Dailey's pants were wet up to the waist and he was not wearing a shirt. Id.

In his application, Dailey relies on the Shaw interview to piece together a timeline that would place Pearcy alone with Boggio from 1:30 a.m. to 3:30 a.m. —

---

[7] Appendix references are to the appendices attached to Dailey's second or successive application filed in this case.

the entire window of Boggio's estimated time of death (this window of time for the murder is not disputed). In Dailey's new timeline, Pearcy, Boggio, Bailey, and Dailey return from Jerry's between midnight and 1:00 a.m. Pearcy and Boggio drop Shaw off at the payphone located several blocks from Pearcy's house at 1:15 a.m. A few minutes later (around 1:20 a.m.) Pearcy and Boggio drive away. Shaw finishes his first call at 1:41 a.m. He finishes his second call at about 2:15 a.m. Around 2:30 a.m. Shaw returns to Pearcy's house, having walked back alone. Between 3:30 a.m. and 4:00 a.m., Pearcy returns alone, wakes up Dailey, and the two of them leave. Between 4:00 a.m. and 5:00 a.m., Pearcy and Dailey enter the house together, where Dailey is seen with wet pants and no shirt.

Dailey's timeline, as he has most recently revised it, makes a lot of assumptions, some of which are contradicted by the record. The only "hard temporal evidence," by Dailey's own admission, is the 1:15 a.m. phone call that Shaw placed to his girlfriend, which was confirmed by her phone records. That call lasted 26 minutes, ending at 1:41 a.m. To fill in the timeline from there, Dailey relies mostly on Shaw's recollection, but Shaw, by his own admission, had been drinking so heavily that he passed out before the rest of the group went to Jerry's.[8]

_____

[8] Dailey also cites the testimony of an impartial witness, Deborah North, who stated in her deposition that she saw Boggio at the bar where she worked "around midnight or right after that" on the night of the murder. App'x CC at 4. Boggio was asking for help freeing a car that was stuck in the sand. Id. North said that Boggio was alone in the bar and was only inside for 5

App'x F at 428. If Shaw, who was highly intoxicated at the time, was wrong in his estimate of how long his second phone call lasted or in how long he sat in the living room talking to Bailey (he stated in one interview that their living room conversation lasted up to two hours), then it is entirely plausible that Pearcy could have come home, retrieved Dailey while Boggio waited in the car, and then traveled to the place where he and Dailey killed her before 3:30 a.m.[9] In other words, even if the "newly discovered" Shaw interview changes the timeline, it does so in a way that is still consistent with Dailey's guilt. That falls far short of the "extraordinarily high" bar Dailey must meet under Herrera, 506 U.S. at 417.

Dailey's new timeline is also contradicted by testimony that he himself gave under oath at an evidentiary hearing in 2003. He testified then that Pearcy woke him up at "about 2:20 in the morning" and that he and Pearcy returned from their

---

minutes; that Boggio had at least one male companion (and possibly more) waiting for her in the car; and that the car was freed 30 minutes to an hour after Boggio arrived. Id. at 6–10. North estimated that Boggio departed at 12:30 a.m. or 1:00 a.m. Id. at 10. Dailey does his best to massage North's testimony to fit his timeline, but it's a stretch. He assumes that Boggio arrived at the bar close to when it closed at 1:45 a.m., not around midnight as North recalled; and he also assumes that Boggio's car was stuck for an hour, the absolute top of North's estimate. Even then, Pearcy and Boggio (and anyone else who was with them) would have left the bar at 2:45 a.m., leaving a 45-minute window for Pearcy to pick up Dailey and for the two to murder Boggio. If Pearcy and Boggio arrived at the bar before 1:45 a.m. or stayed for less than an hour, that 45-minute window available for the murder gets even bigger.

[9] Dailey's new timeline is ambiguous about whether Shaw was talking to Bailey before Pearcy came home alone, or whether he instead slept on the couch. That is probably because Shaw contradicted himself on that point: in his original interview he said that he fell asleep only after Pearcy's solo return, but at a 2003 evidentiary hearing he said that he fell asleep for 60 to 90 minutes before Pearcy came back.

late-night outing at "about 3:30 in the morning." App'x FF at 17–18. That puts him

and Pearcy together for more than half of the 1:30 a.m. to 3:30 a.m. window for

Boggio's murder. Now that Dailey has changed his factual theory of innocence —

not just that Pearcy and Boggio were alone on the night of the murder until about

2:20 a.m., id., but that they were alone from 1:30 a.m. to 3:30 a.m. — he has also

changed his timeline to fit his theory. Even accepting the version of Shaw's story

most favorable to Dailey, it does not establish that Dailey was not with Pearcy and

Boggio during the murder window, it only raises a possibility that he was not. And

a possibility is not enough.

     Dailey has also done little to undermine the credibility of jailhouse

informants James Leitner and Pablo DeJesus, who testified against him. Leitner

and DeJesus worked in the law library at the jail where Dailey and Pearcy were

detained before trial, and they helped pass notes between Dailey and Pearcy. They

also made copies of some of those notes. The two men testified that they overheard

Dailey confess to murdering Boggio. App'x H; App'x IIII. Dailey's "new

evidence" relating to them — letters from DeJesus and Leitner to the prosecutor

and court in Dailey's case and in one other case — shows that the two informants

were savvy negotiators who tried to get a good deal for their testimony. That is

hardly surprising. But the jury knew, through cross-examination, that Leitner and

DeJesus were getting significant benefits for their testimony, and their letters do not include any new material facts about those benefits. App'x H at 494–501; App'x IIII at 502–30.

Dailey also offers "new evidence" from Pearcy, a December 2019 sworn declaration in which Pearcy says that: "James Dailey had nothing to do with the murder of Shelly Boggio. I committed the crime alone. James Dailey was back at the house when I drove Shelly Boggio to the place where I ultimately killed her." App'x CCC. Dailey also points to a 2017 affidavit Pearcy executed that says substantially the same thing. App'x BBB. But when Pearcy was called to testify at a state court evidentiary hearing about the 2017 affidavit, "[a]fter admitting that he signed the affidavit, he testified that its contents were not true." See Dailey v. State, 279 So. 3d 1208, 1213 (Fla. 2019). And both of those Pearcy affidavits are inconsistent with the detailed sworn statement that he gave to investigators in 1985, in which he said that Dailey murdered Boggio alone. App'x A.

Pearcy cannot seem to make up his mind about whether he killed Boggio or not, which makes his affidavits unreliable for many of the same reasons recanting trial witnesses are unreliable. See, e.g., In re Davis, 565 F.3d at 825 ("[R]ecantation testimony 'upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely

to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction.'") (quoting <u>Dobbert v. Wainwright</u>, 468 U.S. 1231, 1233–34 (1984) (Brennan, J., dissenting)); <u>United States v. Santiago</u>, 837 F.2d 1545, 1550 (11th Cir. 1988) ("[R]ecantations are viewed with extreme suspicion by the courts.").

Finally, there is more evidence of Dailey's guilt that his application does not convincingly address. He does not dispute that: his pants were wet up to his waist when he arrived home with Pearcy (and without Boggio) in the early morning hours of May 6; he didn't have a shirt on; Boggio's body was found floating in the water; she had been stabbed, strangled, and drowned. His explanation for his wet pants? He claimed that Pearcy had taken him out to the beach around 4:00 a.m. to play Frisbee — right after he claims that Pearcy had brutally murdered a fourteen-year-old child.

There are also the four notes that he and Pearcy passed in jail, which implicate Dailey in the murder, show that he and Pearcy were trying to coordinate their trial testimony to get each other out of trouble, and that are inconsistent with the story Dailey now tells. Doc. 117 at 5. The district court summarized the contents of those notes as follows: "The four items inculpate Mr. Dailey. They are consistent with co-actors ('partners' as Dailey says in one note) who are trying to

game their respective trials. One of Pearcy's notes expressly implicates Dailey as [the] murderer, consistent with Pearcy's [state attorney office] statement. The notes in Dailey's hand are inculpatory and inconsistent with the facts as he now portrays them." Id.

There is also Dailey's behavior after the murder. He, Pearcy, Shaw, and Bailey all went to Miami the next day without any forewarning or planning. App'x E at 387. Everyone packed up around 7:30 a.m. or 8:00 a.m. that morning, which would have been just two or three hours after the alleged frisbee game. App'x F at 424. According to Shaw's 1985 interview — again, the linchpin of Dailey's actual innocence argument — Dailey was acting bizarre the morning after the murder; he was unusually quiet, and he spoke alone with Pearcy in hushed tones. App'x J. They stopped at a laundromat and a car wash right before they left. App'x E at 385–87; App'x J. Dailey testified in 2003 that it was all Pearcy's idea to go to Miami. App'x FF at 19. But even if it was, that does not explain Dailey's decision to go with them and spend only a single night in Miami before taking a bus to Arizona.[10] Id. at 18–21.

---

[10] In his application Dailey offers an explanation that is based on his own 2003 testimony and some statements from Pearcy. Dailey asserts that during their Frisbee game between 3:30 a.m. and 5:00 a.m, Pearcy told Dailey that he that had to move out because Bailey wanted to turn the bedroom Dailey had been using into a nursery. And only two to three hours later Dailey was on his way to Miami. The timing is quite a coincidence, to say the least, when one considers that Boggio was murdered between 1:30 a.m. and 3:30 a.m. that same morning.

For all of these reasons Dailey has failed to show that he has a reasonable likelihood of meeting the "extraordinarily high" burden of making a "truly persuasive demonstration of innocence," <u>Herrera</u>, 506 U.S. at 417, even if the law permitted him to bring a freestanding actual innocence claim in a second or successive application. He therefore has not made a prima facie showing under § 2244(b)(3)(C). <u>See</u> <u>In re Holladay</u>, 331 F.3d at 1173.

## II.   <u>BRADY</u> CLAIM

Dailey next seeks authorization to bring a claim under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), based on the State's alleged failure to disclose (1) the Indian Rocks Beach police report, (2) recorded interviews, and (3) some letters between the jailhouse informants and the prosecutors in Dailey's case along with two letters between the jailhouse informants and courts. App'x PP. On this claim Dailey has also failed to make a prima facie showing that the claim satisfies the requirements of § 2244(b)(2)(B).

### A.   <u>Indian Rocks Beach Police Report and Recorded Interviews</u>

Dailey contends that shortly after the murder, the Indian Rocks Beach police department recorded interviews of several potential witnesses and summarized those interviews in a police report. One of the interviews was with Oza Shaw, and Dailey alleges that the interview contained exculpatory information because it

discredited the State's theory about where Dailey was when Shelly Boggio was murdered. According to Dailey, the State did not turn over the police report or the recorded interview before or during the trial, or during any post-conviction proceedings. Instead, he says that he first saw the police report in 2017, and that he filed a public records request to obtain the tapes after seeing the report's summary of Shaw's interview. He now seeks to assert a Brady claim based on this "newly discovered" evidence.

In addition to the "actual innocence plus" standard we have already discussed, § 2244(b)(2)(B) also requires a petitioner to show that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." 28 U.S.C. § 2244(b)(2)(B)(i). That means a petitioner cannot rely on facts that he knew or could have discovered with due diligence when he filed an earlier federal habeas petition to justify filing another one. See Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1359 (11th Cir. 2007) ("What matters under § 2244(b)(2)(B)(i) is whether [the petitioner], with the exercise of due diligence, could have discovered [the] facts [he now presents to us] at the time he filed his first federal habeas petition.").

Dailey cannot show the required reasonable diligence. We will start with the police report. He contends that he could not have brought his Brady claim in an

earlier petition because the State did not disclose the police report at trial or during any of his post-conviction proceedings. But he also acknowledges that his own "prior federal habeas counsel . . . discovered a copy of this report among its papers in 2017." The federal habeas counsel that Dailey is referring to is the "Capital Collateral Regional Counsel-Middle Region," which represented him in his first federal habeas proceedings in 2007. Dailey does not explain how or when that report came into his federal habeas counsel's possession. More importantly, he offers no evidence that it was not in his counsel's possession before his first federal habeas petition was filed in 2007. As a result, he has failed to show that he did not have, or could not have obtained with due diligence, the police report when he filed his first federal habeas petition.[11]

That brings us to the copy of Shaw's recorded interview, which Dailey claims he could not obtain until December 2019, the month after he filed his second federal habeas petition. Even if that were true, it does not change the result. Dailey identifies no material differences between the police report's summary of

---

[11] On February 25, 1997, Dailey made a broad demand for public records from the Pinellas County Sheriff's Office. On April 8, 1999, he made another demand for public records from the Pinellas County Sheriff's Office. The Sheriff's Office responded that it had already complied with his 1997 request and had provided any and all records for Dailey. Dailey does not point to a time between 1999 and 2017 when he discovered the Indian Rocks Beach police report or a time when the State would have provided him with that report. He provides no evidence or even a theory about how and when an outside party would have provided him the police report after he filed his first federal habeas petition. The only explanation left is that it has been in his papers since at least 1999.

Shaw's interview and the copy of the recorded interview itself as it relates to potentially exculpatory evidence. App'x V; App'x J. As a result, the date on which Dailey's <u>Brady</u> claim could have been filed is tied to the police report, not the recorded interview that it describes. Dailey's application does not demonstrate that he did not have the police report in 2007. Which means that his application certainly fails to show that he could not have discovered the police report, had he exercised due diligence, before he filed his first federal habeas petition that same year. It follows that he has not made a prima facie showing that this claim satisfies the requirements of § 2244(b)(2)(B)(i).

## B. <u>Jailhouse Informant Letters</u>

Dailey also contends that two of the jailhouse informants who testified against him at trial sent multiple letters to the State prosecutor and to courts about what the two of them would receive in exchange for their testimony. He claims that the State failed to disclose those letters to him before trial, during trial, and during all of his post-conviction proceedings. He argues that because of this failure, he was not aware of the letters until a newspaper obtained them through a public records request and published an article about them on December 19, 2019. At that point, Dailey says, his counsel requested the letters and received them from the author of the article.

Assuming that Dailey acted with due diligence in learning about the letters in the first place and assuming that the State's failure to disclose them might constitute a <u>Brady</u> violation — and we mean it when we say "assuming" — Dailey has still failed to make a prima facie showing that he meets the requirements under § 2244(b)(2)(B)(ii). He has failed because he has not shown that the letters "would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty" of murdering Shelly Boggio.[12]

At best, the letters show that two of the three jailhouse informants who testified against Dailey at trial were motivated at least in part by the State's promises to revise their plea agreements or reduce their sentences. But those facts were already known to the jury in Dailey's case, because both of the jailhouse informants testified about those benefits and were subjected to cross-examination. App'x H; App'x IIII. Documentary evidence that is cumulative of the jailhouse informants' testimony is not sufficient to establish "by clear and convincing

---

[12] The Supreme Court has suggested that cumulative evidence generally is not material for <u>Brady</u> purposes. <u>See, e.g.</u>, <u>Turner v. United States</u>, 137 S. Ct. 1885, 1894–95 (2017) (holding that evidence which was "largely cumulative of impeachment evidence petitioners already had and used at trial" was not material under <u>Brady</u>); <u>see also</u> <u>Nelson v. Nagle</u>, 995 F.2d 1549, 1555 (11th Cir. 1993) (holding that two photographs the government allegedly withheld were not material under <u>Brady</u> because they were "at best cumulative evidence").

evidence" that the jury would not have found Dailey guilty of murdering Shelly Boggio. 28 U.S.C. § 2244(b)(2)(B)(i). There is no prima facie case.

## III.    INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Finally, Dailey seeks authorization to file a claim asserting that his trial counsel was ineffective for failing to obtain a copy of Shaw's recorded interview despite the State's failure to disclose it. He contends that he could not have filed this claim in an earlier petition for the same reason he could not have filed his Brady claim in an earlier petition: he did not have a copy of the recorded interview until December 2019.

But as we have already explained, the police report summarized Shaw's recorded interview and the recording added nothing material to the summary. So, like his Brady claim, the date on which Dailey could have filed his ineffective assistance claim is tied to when he obtained, or could have obtained with due diligence, the police report. And that is 1999 at the latest. See supra note 11. Once he had or with reasonable diligence could have had that report, both the existence of the "exculpatory" interview and his trial counsel's failure to obtain it became apparent. He therefore has not made a prima facie showing that "the factual predicate[s] for the claim could not have been discovered previously," as he must under § 2244(b)(2)(B)(i).

## IV.    CONCLUSION

Because Dailey has failed to make a prima facie showing that the claims in his application meet the requirements under 28 U.S.C. § 2244(b), his application for leave to file a second or successive petition is DENIED.

WILSON, Circuit Judge, concurring:

I agree that Dailey's application should be denied.   I write separately to explain that, despite our precedent, § 2244(b)(2)(B) does not require Dailey to establish his actual innocence *and* an additional constitutional error.

The Antiterrorism and Effective Death Penalty Act (AEDPA) says that a habeas petitioner can bring a new claim in a successive petition if "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."   *Id.* § 2244(b)(2)(B)(ii).   We have held this to mean that a successive habeas applicant cannot sustain a freestanding actual innocence claim; he must also point to a separate constitutional violation to justify a successive habeas petition.   *In re Davis*, 565 F.3d 810, 823–24 (11th Cir. 2009) (per curiam) (stating that to hold otherwise would render meaningless the phrase "but for constitutional error").   Yet proving that a person awaiting execution is actually innocent establishes one of the most egregious constitutional violations imaginable.   *See Herrera v. Collins*, 506 U.S. 390, 419 (1993) (O'Connor, J., concurring) ("[T]he execution of a legally and factually innocent person would be a constitutionally intolerable event."); *id.* at 431–37 (Blackmun, J., dissenting)

("[I]t violates the Eighth and Fourteenth Amendments to execute a person who is actually innocent."); *see also id.* at 417 (assuming, without deciding, that at least in a capital case, a freestanding actual innocence claim might warrant federal habeas relief, but only upon an "extraordinarily high" and "truly persuasive" threshold showing).   Thus, AEDPA's procedural bars should not be read to preclude a death-row inmate from filing a second or successive habeas petition when he has alleged a viable freestanding actual innocence claim.

To explain, I think that when a successive habeas applicant in the death-penalty context meets the "extraordinarily high" and "truly persuasive" threshold showing of actual innocence required by AEDPA, *see id.* at 417, he has already proven a constitutional violation sufficient to satisfy the stringent requirements of § 2244(b)(2)(B).   And if that is not a proper construction of AEDPA, the result should still be the same.   If AEDPA truly aims to limit federal courts from reviewing a claim of actual innocence by a person facing execution, then the statute must surely give way to the Eighth and Fourteenth Amendments. "AEDPA cannot possibly be applied when to do so would offend the Constitution and the fundamental concept of justice that an innocent man should not be executed."   *In re Davis*, 565 F.3d at 827 (Barkett, J., dissenting).

That is not the case today, however.    In light of the testimony of Leitner and Skalnik regarding Dailey's confession, and the testimony of Shaw and Bailey that Dailey returned to the house with wet pants hours before Boggio's body was found in the water, the newly discovered evidence does not demonstrate that no rational factfinder would have convicted Dailey.

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-15145-P

ERRATA
_____

IN RE: JAMES DAILEY,

Petitioner.

_____

Application for Leave to File a Second or Successive
Habeas Corpus Petition, 28 U.S.C. § 2244(b)
_____

(February 19, 2020)

The opinion has been changed as follows:

On page 9, replaced "Johnson v. Warden, GDCP, 805 F.3d 1317, 1324 (11th

Cir. 2015)" with "Johnson, 805 F.3d at 1324."

On page 9, added spaces on either side of the em-dash before the word

"meaning."

On page 9, deleted the comma after "1073."

On page 9, added a space between "S." and "Ct." in the citation to Michigan

v. Bay Mills Indian Cmty.

On page 10, added spaces on either side of each of the two em-dashes that appear on this page.

On page 11, replaced "Holladay" with "In re Holladay."

On page 19, added "[the]" before "murderer."

On page 20, replaced "Holladay" with "In re Holladay."

On page 20, replaced "Brady claim based on" with "claim under Brady v. Maryland, 373 U.S. 83 (1963), based on."

On page 20, replaced "an" with "the" before "Indian Rocks Beach police report."

On page 23 at footnote 11, replaced "The Sheriff's office alleged that it had previously complied" with "The Sheriff's Office responded that it had already complied."

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-15145-P

ERRATA

_____

IN RE: JAMES DAILEY,

Petitioner.

_____

Application for Leave to File a Second or Successive
Habeas Corpus Petition, 28 U.S.C. § 2244(b)

_____

This order has been changed as follows:

On page 22 footnote 11 – the spelling of "Sheriff'" corrected.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 30, 2020

Carol Wright
Federal Public Defender's Office
400 N TAMPA ST STE 2700
TAMPA, FL 33602

Appeal Number:  19-15145-P
Case Style:  In re: James M. Dailey
District Court Docket No:  8:19-cv-02956-WFJ-AAS

The enclosed published order has been entered. No further action will be taken in this matter.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: David L. Thomas
Phone #: (404) 335-6171

Enclosure(s)

DIS-4 Multi-purpose dismissal letter